UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
JOSEFINA S. VELASQUEZ,

                Plaintiff,

      - against -

ROBERT M. GATES, Secretary of the
United States Department of Defense,

                Defendant.
------------------------------------------------------X

**MEMORANDUM & ORDER**

08 CV 2215 (CLP)

On June 2, 2008, plaintiff Josefina S. Velasquez, M.D. filed this action against the United States Department of Defense ("DOD") and United States Military Entrance Processing Command ("USMEPC"), claiming employment discrimination on the basis of age in violation of the Age Discrimination in Employment Act ("the ADEA"), 29 U.S.C. § 621 *et seq*. On February 12, 2009, the parties stipulated that all claims against the DOD and USMEPC would be withdrawn, and Robert M. Gates, Secretary of the United States Department of Defense, would be substituted as the proper defendant in the case. On April 9, 2009, the parties consented to the jurisdiction of the magistrate judge for all purposes, including judgment. Presently before the Court is defendant's motion for summary judgment, which was filed on August 30, 2010.

For the reasons set forth below, defendant's Motion for Summary Judgment is granted in part and denied in part.

## FACTUAL BACKGROUND

Plaintiff Josefina Velasquez, M.D., was born on April 30, 1941. (Def.'s 56.1 Stmnt[1] ¶ 2). A resident of Brooklyn, New York, Dr. Velasquez was licensed to practice medicine in New York, and worked at the New York Military Entrance Processing Station ("NYMEPS") as a "fee-based" physician prior to April 17, 2006. (Id. ¶¶ 1, 3, 4, 5, 9). Beginning on April 17, 2006, Dr. Velasquez was appointed as an Assistant Chief Medical Officer ("ACMO") on a "career conditional" basis, "subject to completion of a one year initial probationary period." (Id. ¶ 6).

According to defendant, NYMEPS is tasked with the responsibility of ensuring that new recruits to the United States Armed Forces are "physically, morally and administratively qualified" to serve. (Id. ¶¶ 39, 40). NYMEPS serves as the regional processing center for these new recruits, who must undergo several stages of review and processing, including medical clearance. (Id. ¶ 41). From July 2006 until June 2009, the military officer in charge at NYMEPS was Commander Ellen Emerson (id. ¶¶ 11, 12; Pl.'s Mem.[2] at 3), who one witness described as being in her early- to mid-40s at the time. (Deyro Tr.[3] at 65). At the time of plaintiff's termination in April 2007, Commander Emerson had supervised plaintiff for eight months. (Pl.'s Mem. at 3; Wotorson Aff.,[4] Ex. 11). According to plaintiff, the Commander had "never

---

[1]Citations to "Def.'s 56.1 Stmnt" refer to Defendant's Rule 56.1 Statement of Material Facts, which was filed on August 30, 2010.

[2]Citations to "Pl.'s Mem." refer to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, dated December 8, 2010.

[3]Citations to "Deyro Tr." refer to the transcript of testimony given by Dr. Edmund Deyro, taken at a Fact-Finding Conference held at Ft. Hamilton on January 28, 2008, attached as Exhibit Q to Defendant's Rule 56.1 Statement of Material Facts.

[4]Citations to "Wotorson Aff." refer to the Affirmation of Ambrose Wotorson, Esq., dated January 5, 2011.

supervised any physicians before she was assigned the Command of NYMEPS. (Pl.'s Mem. at 4; Wotorson Aff., Ex. 11 at 31).

According to defendant, two categories of physicians were employed at NYMEPS during the period covered by the Complaint: 1) "fee-based" physicians who were contract physicians employed on a part-time basis and who were responsible only for performing physical examinations; and 2) two full-time Medical Officers who were physicians, charged generally with "performing full and thorough medical evaluations" in accordance with "applicable regulations and directives." (Def.'s 56.1 Stmnt ¶ 60). The Medical Officers were also responsible for supervising the fee-based physicians. (Id. ¶ 62). During the time covered by the Complaint, the two Medical Officers on staff were plaintiff, holding the title of Assistant Chief Medical Officer, and Dr. Edmund Deyro,[5] who held the title of Chief Medical Officer ("CMO"), and as such, was plaintiff's supervisor. (Id. ¶¶ 17-18).

According to defendants, the processing of recruits at NYMEPS generally begins with the completion of medical forms, and then basic tests such as hearing, eye, blood, and urine tests, which are performed by medical technicians. (Id. ¶ 43). Once those tests are completed, recruits are transferred to the medical floor where a Medical Officer conducts an interview and full examination of the recruit, including orthopedic tests on the recruits' joints. (Id. ¶¶ 44-45). Medical Officers also review with the recruit his/her paperwork, including consultative reports prepared by medical specialists if the recruit has specific medical issues. (Id. ¶ 47). After the

---

[5]Dr. Deyro, who was born on February 25, 1947 (Def.'s 56.1 Stmnt ¶ 19), testified that he is not licensed to practice medicine in New York. (Wotorson Aff., Ex. 13 at 12). Plaintiff claims that Dr. Deyro confided to her "that he would do anything that NYMEPS told him to do because he had 'nowhere to go.'" (Id., Ex. 8 ¶ 28).

examination process is completed, the Medical Officers are required to make a determination, termed "profiling," as to whether the recruit is physically qualified for military service. (Id. ¶ 48).

Medical Officers were assigned the responsibility of conducting physical examinations on the basis of gender. (Id. ¶¶ 64, 65). Although the exams of female applicants generally take longer, there are more male applicants, so the Medical Officer performing the exams of the women was required to assist with any remaining male applicants. (Id. ¶ 65). According to defendant, during the time of plaintiff's employment, the entire process generally began at 5:30 a.m. with the aim to finish the process by 3:00 p.m. (Id. ¶¶ 42, 50). In order to accomplish this, the medical floor was required to complete the medical processing by 1:00 p.m. (Id. ¶ 51). According to defendant, delays in the process required overtime pay for civilians. (Id. ¶ 52).

Plaintiff disputes defendant's representation as to how long the process was to take, noting that not only does it take longer to process female applicants, but that there is no written policy stating how many applicants need to be seen in an hour. (Pl.'s 56.1 Stmnt[6] ¶ 50). According to plaintiff, "it is the province of the physician to determine how much time needs to be spent examining an applicant." (Id.)

Defendant claims that in July 2006, NYMEPS was performing poorly in that the rate at which processing was completed had fallen "well below the national average." (Def.'s 56.1 Stmnt ¶ 53). When Commander Emerson was assigned command of NYMEPS, she was charged with fixing these problems. (Id. ¶ 54). During that summer, Commander Emerson began

---

[6]Citations to "Pl.'s 56.1 Stmnt" refer to Plaintiff's 56.1 Statement in Opposition to Defendant's Motion for Summary Judgment, which was filed on January 5, 2011.

.

receiving complaints from the military recruiting services about delays stemming from the medical processing of applicants. (Id. ¶ 71). Plaintiff points out that the Commander could not recall if the complaints were about the plaintiff in particular or just the "medical floor" and she did not recall recording these complaints at the time. (Wotorson Aff., Ex. 11 at 26-27).

Defendant further claims that during that summer of 2006, Dr. Deyro noticed that plaintiff was taking "an excessive amount of time interviewing and conducting physicals" of the female recruits. (Def.'s 56.1 Stmnt ¶ 66 (internal quotation omitted)). Dr. Deyro testified that he saw plaintiff sitting in the female section after completing the female exams when she should have been assisting him with the male applicants. (Id. ¶ 67). Plaintiff disputes this contention, denying that she ever had time to be sitting around. (Pl.'s 56.1 Stmnt ¶ 67). Plaintiff also contends that despite Commander Emerson's testimony about "numerous complaints," none were about plaintiff specifically and extensions of time were frequently requested even before the Commander took over. (Id. ¶¶ 52-53).

Commander Emerson testified that she had heard that some of the fee-based physicians were frustrated with plaintiff, but she could not recall any of their names. (Wotorson Aff., Ex. 11 at 85). Dr. Reodique also testified that several medical technicians complained about plaintiff's speed, including Maria Parrish and Mr. Laguna, but Reodique never informed anyone else about these complaints. (Wotorson Aff., Ex. 12 at 37, 42-43).

In September 2006, Dr. Deyro reassigned plaintiff to the male section, with Dr. Deyro performing the few female exams and returning to the male section to conduct physicals. (Def.'s 56.1 Stmnt ¶ 68). According to defendant, after the reassignment, a male applicant complained that plaintiff had called him "stupid." (Id. ¶ 69). Plaintiff disputes that she was ever told about

this or counseled about being "slow" or rude. (Pl.'s 56.1 Stmnt ¶¶ 68-69).

Defendant claims that Sergeant Erin Davis, the Non-Commissioned Officer in Charge, tasked with the responsibility to manage the civilian and military staff at NYMEPS (Def.'s 56.1 Stmnt ¶ 16), informed Commander Emerson in January and February 2007 that she and Dr. Deyro had concerns about plaintiff's ability to process the applicants. (Id. ¶ 70). Although plaintiff does not dispute that Sgt. Davis may have said this, she denies that Dr. Deyro ever counseled her. (Pl.'s 56.1 Stmnt ¶ 70).

Although Commander Emerson initially testified that Dr. Deyro had told her about his counseling sessions with plaintiff (Wotorson Aff., Ex. 11 at 86-87), defendant concedes that plaintiff was never formally counseled by either Dr. Deyro or Commander Emerson on her speed in processing applicants or on her confrontational approach. (Def.'s 56.1 Stmnt ¶¶ 119, 121). However, Dr. Deyro testified that he considered plaintiff's reassignment to the male section in September 2006 as a communication to plaintiff about problems with her job performance. (Id. ¶ 120).

Defendant asserts that in March 2007, both Dr. Deyro and plaintiff were tasked with conducting ear cleaning procedures as part of their duties. (Id. ¶ 75). Previously, these procedures had been referred to private physicians off-site, but, according to defendant, Commander Emerson informed Dr. Deyro that the procedure would be conducted by the Medical Officers. (Id. ¶¶ 77, 78). Plaintiff contacted Dr. Suarez at a military processing station in Florida where she learned that these ear cleaning procedures were "'rarely, if ever'" performed by the Medical Officers. (Id. ¶ 79). Dr. Deyro's call to a Dr. Santos in Syracuse, New York, confirmed that these procedures were rare there as well. (Id.) Plaintiff claims that mandating that she and

Dr. Deyro do ear cleaning was discriminatory because "no other physicians in the MEPSCOM system were tasked to this." (Pl.'s Mem. at 4; Wotorson Aff., Ex. 8 ¶ 2).

In mid-March 2007, both Dr. Deyro and plaintiff called Dr. Robert Ruiz, the top military physician for the Eastern Sector of USMEPC, to complain about the ear cleaning process, which plaintiff felt "was not part of her normal responsibilities." (Def.'s 56.1 Stmnt ¶ 80). Based on the conversation with Dr. Deyro and plaintiff, Dr. Ruiz suspended the directive to perform the ear cleaning procedure and told the doctors that it would be discussed at an upcoming site visit. (Id. ¶ 82).

On the same day that Dr. Deyro and plaintiff spoke to Dr. Ruiz,[7] plaintiff told an applicant that ear cleaning had been suspended. (Id. ¶ 85). Sgt. Davis questioned plaintiff about her refusal to do the procedure, was told about the conversation with Dr. Ruiz, and returned to her office, upset. (Id. ¶¶ 86-87). Shortly thereafter, Sgt. Davis told plaintiff to report to Commander Emerson, which plaintiff did at the conclusion of her tasks. (Id. ¶¶ 87-88).

Commander Emerson questioned plaintiff about the conversation with Dr. Ruiz, and plaintiff's impression was that the Commander was angry because she and Dr. Deyro had not first addressed the issue with her and because the procedure had been suspended. (Id. ¶ 89). According to plaintiff, Commander Emerson "angrily stated that nobody informed her of this problem." (Pl.'s Mem. at 5; Wotorson Aff., Ex. 8 ¶ 2).

Approximately one week later, Dr. Ruiz visited the facility and conducted a training session on ear cleaning. (Def.'s 56.1 Stmnt ¶¶ 91-92). Thereafter, the procedure was performed

---

[7]Dr. Deyro, who characterized NYMEPS as a "zoo," did not deny that he was "enraged" over the ear irrigation assignment. (Wotorson Aff., Ex. 10 at 35-37; Velasquez Aff., Ex. 14 ¶ 7).

by the medical technicians. (Id. ¶ 93). Defendant contends that plaintiff never actually performed an ear cleaning procedure under the March 2007 directive, and, to the extent that she complained about having to perform the procedure, her complaint was based on the extra burden imposed and not based on any claim of age discrimination. (Id. ¶¶ 83, 84). In her Memorandum of Law, plaintiff asserts that in fact, plaintiff believed that "she and Dr. Deyro were tasked to do this because of their ages." (Pl.'s Mem. at 4; Wotorson Aff., Ex. 8 ¶ 2).

On April 9 and 10, 2007, Dr. Deyro was absent from work due to illness. (Def.'s 56.1 Stmnt ¶ 97). Dr. Velasquez was acting as CMO on those days. (Wotorson Aff., Ex. 11 at 43). Two fee-based physicians were asked to help perform physicals. (Def.'s 56.1 Stmnt ¶ 98). Although one of the fee-based physicians left early on both days, the other doctor stayed until all exams were completed. (Id. ¶¶ 99-100). According to defendant, all applicants were cleared by 4:50 p.m. on April 9 and by 4:20 p.m. on April 10, well after the 1:00 p.m. cut-off for medical review. (Id. ¶¶ 103-05). Commander Emerson received numerous complaints about the delays on these two days which required recruiting representatives to request extensions of their time to complete processing. (Id. ¶¶ 106, 107). Commander Emerson concluded that the delays were attributable to plaintiff's poor job performance. (Id. ¶ 108).

Again, plaintiff denies that these complaints were about her performance. (Pl.'s 56.1 Stmnt ¶ 71). Instead, plaintiff contends that because of a computer problem, intake did not begin at 5:30 a.m., but was delayed until 10:45 a.m. (Velazquez Aff., Ex. 14 ¶ 9; Wotorson Aff., Ex. 8 ¶ 12; Ex. 11 at 41-42).

According to plaintiff, a similar computer problem caused a delay in the start time on the following day, April 10, 2007 (Wotorson Aff., Ex. 8 ¶ 12; Velasquez Aff., Ex. 14 ¶ 10);

Commander Emerson could neither confirm nor deny the computer problems. (Wotorson Aff., Ex. 11 at 51). Plaintiff asserts that Dr. Deyro was still out sick on April 10 and that she was the only medical officer to process the 30 intake applicants present that morning. (Wotorson Aff., Ex. 8 ¶ 12; Velasquez Aff., Ex. 14 ¶¶ 11, 12). In addition, the medical technician was attending a conference that morning and was not available to assist plaintiff. (Wotorson Aff., Ex. 14 ¶ 12; Velasquez Aff., Ex. 14 ¶ 17). Dr. Reodique was called in to assist because of the lack of staff, but plaintiff claims that he was only able to stay until 10:30 a.m. because he had his own office hours. (Wotorson Aff., Ex. 8 ¶ 12; Velasquez Aff., Ex. 14 ¶ 15). Nevertheless, plaintiff claims that she was able to finish all but two exams by 2:30 p.m. (Wotorson Aff., Ex. 8 ¶ 12; Velasquez Aff., Ex. 14 ¶ 18).

On April 10, 2007, Commander Emerson and Sgt. Davis spoke to plaintiff. (Def.'s 56.1 Stmnt ¶¶ 109-11). Commander Emerson told plaintiff that "getting applicants off the floor two hours late was unsatisfactory." (Wotorson Aff., Ex. 11 at 56). She allegedly told plaintiff, "in a raised voice," the following: "'Dr. Velasquez, you have no speed. You have no speed. You are too slow. It takes you a long, long time to finish an applicant." (Def.'s 56.1 Stmnt ¶ 111 (quoting Velasquez Dep.[8] at 166, 173)).[9] Commander Emerson told plaintiff that her slow speed was resulting in overtime for civilian staff members and, noting that plaintiff was "on [her] probationary period," the Commander indicated that "might not renew [her] contract." (Id. ¶¶ 112-113). In response, plaintiff explained that some applicants have medical problems that need

---

[8]Citations to "Velasquez Dep." refer to the transcript of the deposition of plaintiff, filed as Exhibit B to Defendant's 56.1 Statement of Material Facts.

[9]Indeed, in her deposition, Commander Emerson admitted that she had, in effect, told plaintiff she was too slow. (Wotorson Aff., Ex. 11 at 103).

to be addressed and some lie about their medical conditions on their questionnaires. (Id. ¶ 116).

Plaintiff believed the criticism was unfair because Commander Emerson was not a physician and did not appreciate the demands of the job. (Id. ¶ 114). She also believed that even though there was no reference to plaintiff's age, the criticism displayed discriminatory animus on the Commander's part: "'you could read in between the lines, you know, that it's about age, age-related.'" (Id. ¶ 115). Indeed, plaintiff notes that in her deposition, the Commander admitted knowing that plaintiff was not in her forties, and she did not deny that to the extent that she thought about plaintiff's age, she did so before the termination. (Wotorson Aff., Ex. 11 at 116-18).

Following her conversation with plaintiff on April 10, 2007, Commander Emerson concluded that plaintiff's poor job performance was affecting the medical processing of applicants and that "it has been very obvious that Dr. Velasquez can't handle the job." (Def.'s 56.1 Stmnt ¶ 124). Based upon plaintiff's job performance, her unwillingness to take responsibility for the delays on April 9, Dr. Deyro's decision to reassign her in September 2006, her unwillingness to perform the ear cleaning procedure, and the need to improve overall performance, Commander Emerson testified that she lost confidence in plaintiff's ability "'to take an active role in improving the command.'" (Id. ¶¶ 125-129; Emerson Dep.[10] at 94-95).

On April 11, 2007, Commander Emerson sent an email to Colonel Barrye Price,[11] Commander of the Eastern Sector of the USMEPC, expressing her view that plaintiff should be

---

[10]Citations to "Emerson Dep." refer to the deposition of Ellen Emerson, filed as Exhibit E to Defendant's 56.1 Statement of Material Facts.

[11]Colonel Price was Commander Emerson's supervisor, with authority over all NYMEPS operations and employees. (Def.'s 56.1 Stmnt ¶¶ 13, 14).

terminated for her inability to timely process applicants and her failure to take responsibility for her job performance on April 10. (Id. ¶ 131). The email stated:

> Our ACMO's one year probation period ends on Monday, 16 April; I do not intend to keep Dr. Velasquez on board. Dr. Ruiz's visit last week highlighted for me what the expectations should be for the ACMO and how she is falling short in her performance. A particular issue is speed – she is very slow in working with applicants on their history and qualifications. Our CMO has been out sick this week and it has been very obvious that Dr. Velasquez can't handle the job. Yesterday we cleared our last applicant from medical after 1530. I have had several complaints from recruiting service commanders this week.

(Id. ¶ 133; Ex. 5). Dr. Ruiz also discussed plaintiff's poor job performance, particularly her "slowness with applicants" and "inability to keep up with the pace required for effective operations." (Id. ¶ 134).

On April 13, 2007, three days before her probationary period was to expire, plaintiff met with Commander Emerson and Sgt. Walker, at which time Commander Emerson read the Separation Memo[12] to plaintiff. (Def.'s 56.1 Stmnt ¶ 136). The Memo, among other things, stated: "This is to inform you that you are being separated from your present position . . . based upon repeated failure to timely complete medical examinations." (Id. ¶ 136). The Memo further states that plaintiff was counseled in January and February 2007 by Dr. Deyro; the Memo further noted that despite this counseling, there were numerous complaints about time spent to process applicants on April 9 and 10, 2007. (Id. ¶ 136; Eskew Decl.[13] Ex. V).

Defendant now concedes that the reference in the Memo to counseling was in error and

---

[12]Defendant has defined the "Separation Memo" as the "Memorandum to Dr. Velasquez Regarding Separation During the Probationary Period," dated April 12, 2007. (Def.'s 56.1 Stmnt ¶ 105).

[13]Citations to "Eskew Decl." refer to the Declaration of Assistant U.S. Attorney David M. Eskew, which was filed on August 30, 2010.

that it was based on the Commander's "mistaken belief" which "arose from Commander Emerson's conversation about the subject with Sgt. Davis during that time period." (Id. ¶ 137). Plaintiff, however, notes that in her deposition, Commander Emerson testified that Sgt. Davis told her in January and February 2007 that plaintiff was being counseled. (Wotorson Aff., Ex. 11 at 74). Commander Emerson testified that sometime in January 2007, Sgt. Davis came to her and told her that Dr. Deyro had just counseled plaintiff. (Wotorson Aff., Ex. 11 at 75).

Plaintiff contends that not only did the Memo contain numerous inaccurate statements, but she argues that defendant's explanation for her termination evolved and changed over time. (Pl.'s Mem. at 10). She points to a "Memorandum For Record," dated April 11, 2007, purportedly prepared by Dr. Deyro, which summarizes plaintiff's history of excessive time in processing applicants and her rudeness. (Wotorson Aff., Ex. 3). The document states that plaintiff "has been verbally counseled" on her "short temper" and excessive time. (Id.) Dr. Deyro confirmed the accuracy of the contents of this April 11, 2007 Memorandum For Record in a Declaration dated April 3, 2008. (Wotorson Aff., Ex. 9). In this Declaration, Dr. Deyro also represented that he had counseled Dr. Velasquez about "her unprofessionalism" on January 17, 2007. (Id.) In another "question and answer" document, Dr. Deyro stated that he told Sgt. Gilliam and Sgt. Davis that plaintiff was "deliberately" slow, frequently left work early, and often exhibited "defiant behavior." (Wotorson Aff., Ex. 10).

Following her termination, plaintiff wrote a letter to Congressman Vito Fossella, stating that "[t]he main reason why the Commander reprimanded me, for the first time, is a vengeance to the incident that in March 29, 2007, I and the CMO, Dr. Deyro, called up the Surgeon General of the Eastern Sector . . . to complain about the ear cleaning." (Def.'s 56.1 Stmnt ¶ 139; Eskew

Decl., Ex. R). The letter further stated that "[s]ince then, it triggered her to find faults on me to the extent of making false allegations, those that are written on the termination paper." (Id.)

On June 2, 2008, plaintiff filed the instant suit, alleging that she was subjected to age discrimination and retaliation in violation of the ADEA. (Compl.[14] ¶ 1). Specifically, plaintiff alleges that she was terminated from her position on April 13, 2007, based on the false charge that she repeatedly failed to complete medical examinations in a timely fashion. (Id. ¶ 8(b), (n)). Instead, plaintiff alleges that she actually was terminated on the basis of age. (Id.) Plaintiff supports her claim by pointing to a number of allegedly discriminatory comments made to her by Commander Emerson. More specifically, plaintiff claims that Commander Emerson's comments that plaintiff was "too slow," "had no speed," and was "taking too long" to complete examinations were "age-based" comments that revealed an animus toward older professionals. (Id. ¶ 8(n)). Plaintiff further alleges that she was terminated in retaliation for complaining to her supervisor, Dr. Ruiz, about the ear cleaning assignments which were not part of her normal responsibilities. She points to the request in mid-March 2007, when she was asked to perform the ear cleaning procedure which she alleges "no other physicians in the [USMEPC] system were tasked to do." (Id. ¶ 8(c),(e)).

Defendant moves for summary judgment, arguing that plaintiff cannot establish a prima facie case of age discrimination with respect to either the March 2007 ear cleaning directive or the termination discussion in April 2007. Defendant further argues that plaintiff has also failed to establish a prima facie case of retaliation. Even if plaintiff makes out a prima facie case, defendant argues that it has demonstrated legitimate, non-discriminatory reasons for its

---

[14]Citations to "Compl." refer to the Complaint, which was filed on June 2, 2008.

employment decision which plaintiff cannot show are pretextual or false.

<br>

## DISCUSSION

A. Summary Judgment

It is well-settled that a party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990). Since summary judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury, see Egelston v. State Univ. College at Geneseo, 535 F.2d 752, 754 (2d Cir. 1976); Gibralter v. City of New York, 612 F. Supp. 125, 133-34 (E.D.N.Y. 1985), the court should not grant summary judgment unless it is clear that all of the elements have been satisfied. See Auletta v. Tully, 576 F. Supp. 191, 194 (N.D.N.Y. 1983), aff'd, 732 F.2d 142 (2d Cir. 1984). In addition, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

Once the moving party discharges its burden of proof under Rule 56(c), the party opposing summary judgment "has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.'" Phillips v. Kidder, Peabody & Co., 782 F. Supp. 854, 858 (S.D.N.Y. 1991) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. Indeed, "the mere existence

of <u>some</u> alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. <u>Id.</u> at 247-48 (emphasis in original). "A defendant may move for summary judgment on the ground that the plaintiff has failed to adduce any evidence of an element of plaintiff's claim, and if the plaintiff fails in response to contest this assertion or adduce such evidence, defendant, without more, will prevail." <u>Giannullo v. City of New York</u>, 322 F.3d 139, 141 n.2 (2d Cir. 2003).

In reversing a grant of summary judgment, the Second Circuit noted that the "[t]rial court's task at the summary judgment motion state of litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." <u>Quaratino v. Tiffany & Co.</u>, 71 F.3d 58, 65 (2d Cir. 1995) (quoting <u>Gallo v. Prudential Residential Servs., L.P.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994)).

## B. The ADEA

The ADEA was enacted "to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b). As part of its statutory scheme, the ADEA prohibits employers from discriminating against employees "with respect to . . . compensation, terms, conditions, or privileges of employment" because of their age. 29 U.S.C. § 623(a)(1). Employers are also prohibited from retaliating against employees for lodging complaints regarding age discrimination. <u>See</u> <u>Gomez-Perez v. Potter</u>, 553 U.S. 474 (2008).

"When there is no direct evidence of discrimination, the burden-shifting analysis of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), determines whether a plaintiff's claims survive summary judgment." <u>Weisman v. N.Y.C. Dept. of Educ.</u>, No. 03 CIV 9299, 2005

WL 1813030, at *4 (S.D.N.Y. Aug. 1, 2005). Under this framework, the plaintiff must first establish a prima facie case of age discrimination. Id. "If a prima facie case is established, then the burden shifts to the employer to set forth a legitimate, nondiscriminatory reason for the employment action." Id. If the employer sets forth a legitimate reason, "the burden shifts back to the plaintiff to show that this stated rationale is a mere pretext for discrimination." Id.

To establish a prima facie case of age discrimination, plaintiff must show that "(i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination." Roge v. NYP Holdings, 257 F.3d 164, 168 (2d Cir. 2001). The Second Circuit has characterized the burden of establishing a prima facie case as "minimal" and "de minimis." Berube v. Great Atlantic & Pacific Tea Co., Inc., 348 Fed. Appx. 684, 686 (2d Cir. 2009) (quoting Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)).

Similarly, to establish a prima facie case of retaliation under the ADEA, a plaintiff must show (i) that she engaged in a protected activity under the ADEA; (ii) that the employer was aware of this activity; (iii) that the employer took an adverse employment action against the plaintiff; and (iv) that there was a causal connection between the protected activity and the adverse action. Kessler v. Westchester County Dept. of Social Servs., 461 F.3d 199, 205-06 (2d Cir. 2006) (citing Cifra v. General Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)).

Once a prima facie case is established under either claim, the burden shifts to defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action. Leibowitz v. Cornell Univ., 584 F.3d 487, 499 (2d Cir. 2009). "The employer's burden of showing a

16

legitimate non-discriminatory reason for its actions is not a particularly steep hurdle."

Hirschberg v. Bank of America, N.A., No. 08 CV 1611, 2010 WL 4872992, at *9 (E.D.N.Y.

Dec. 1, 2010). If the defendant clears this hurdle "the presumption of discrimination created by

the prima facie case drops out of the analysis, and the defendant 'will be entitled to summary

judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of

prohibited discrimination.'" Mario v. P & C Food Markets, Inc., 313 F.3d 758, 767 (2d Cir.

2002) (quoting James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000)).

Plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence

that the legitimate reasons offered by the defendant were not its true reasons but were a pretext

for discrimination." Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143

(2000)). "To establish a disparate-treatment claim under the plain language of the ADEA . . . a

plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." Gross

v. FBL Fin. Servs., Inc., 129 S. Ct. 2343, 2350 (2009). The Court must "determine, by looking at

the evidence [plaintiff] has proffered and the counter-evidence [defendant] has presented,

whether [plaintiff] has raised sufficient evidence upon which a reasonable jury could conclude by

a preponderance of the evidence that her age was a 'but for' cause of the adverse employment

action." Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 107 (2d Cir. 2010).


C. Analysis

In her Complaint, plaintiff alleges that she was subjected to age discrimination when in

March 2007, she was asked to perform a medical ear cleaning procedure which she contends "no

other physicians in the MEPSCOM system were tasked to do." (Compl. ¶ 8(c)). She further

claims that she was terminated based on her age, citing comments made by Commander Emerson regarding the speed with which she performed her duties. (Id. ¶ 8(n), (v)). Plaintiff also alleges that she was terminated because she complained to her superiors about the ear cleaning procedure. (Id. ¶ 17).

Although defendant concedes that plaintiff is over 40 years of age and thus satisfies the first prong of the prima facie requirement, defendant contends that plaintiff cannot establish either the third or fourth prongs with respect to the March 2007 incident or the fourth element as to her termination. With respect to her claim for retaliation, defendant contends that plaintiff cannot establish that she engaged in a protected activity under the ADEA when she complained about the ear cleaning procedure.

1. The Ear Cleaning Procedure

Turning first to plaintiff's claim that she was subjected to age discrimination in connection with the March 2007 ear cleaning directive, defendant argues that there was no "materially adverse change" in the condition of her employment sufficient to satisfy the third prong of the prima facie test. (Def.'s Mem.[15] at 7). A materially adverse change in the conditions of employment requires a change in conduct that is "'more disruptive than a mere inconvenience or an alteration of job responsibilities' and can include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities.'" Leibowitz v.

_____

[15]Citations to "Def.'s Mem." refer to Defendant's Memorandum of Law in Support of Motion for Summary Judgment, which was filed on August 30, 2010.

Cornell Univ., 584 F.3d at 498 (quoting Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)). The fact that there is a change in the employee's job duties is not a sufficiently adverse change unless the change is "so unsuited to plaintiff's skills as to constitute 'a setback to plaintiff's career.'" Morrison v. Potter, 363 F. Supp. 2d 586, 560 (S.D.N.Y. 2005) (quoting Galabya v. N.Y.C. Dept. of Educ., 202 F.3d at 641); see also Islamic Soc. of Fire Dep't Personnel v. City of N.Y., 205 F. Supp. 2d 75, 87 (E.D.N.Y. 2002). Defendant contends that the ear cleaning procedure fell within the boundaries of plaintiff's job description to the extent that it falls within "other duties as assigned" and is part of ensuring a "thorough and complete" examination. (Def.'s Mem. at 8).

Moreover, even if the ear cleaning process was a change in her duties, plaintiff has not demonstrated how it adversely affected her employment, nor has she shown that it constituted a "setback to her career." Not only was the ear cleaning procedure well within plaintiff's skills as a physician and, indeed, previously a duty referred out to private physicians (Def.'s 56.1 Stmnt ¶ 78), plaintiff was never actually required to perform the procedure, and the directive was withdrawn within a week of being issued. (Id. ¶ 94).

Plaintiff's complaint about having to do the procedure was based on her claim that she would not have sufficient time in view of her other responsibilities: "Why do we have to do the ear cleaning? . . . We have no time to do anything. We are overwhelmed with all the applicants and everything." (Def.'s 56.1 Stmnt ¶ 81). Plaintiff's expressed annoyance at the inconvenience caused by having to periodically perform this additional task, which is clearly a medically related procedure performed by physicians, does not transform the employer's decision into an adverse employment action. See Islamic Soc. of Fire Dep't Personnel v. City of N.Y., 205 F. Supp. 2d at

19

85 (noting that "courts in this district have universally rejected attempts by plaintiffs to show an adverse employment action based simply on the plaintiff's personal feelings about the employer's actions"); see also Galabya v. N.Y.C. Bd. of Educ., 202 F.3d at 640.

Even if plaintiff could establish that the directive requiring her to clean ears was an adverse employment action, plaintiff has made no showing that would satisfy the fourth element of the test – namely, that the directive was given under circumstances from which age discrimination could be inferred. Although plaintiff alleges that no other physicians in the MEPSCOM system were required to perform the ear cleaning process, her evidence ignores the fact that the only other individual subject to the directive was Dr. Deyro, who like plaintiff, was over 40 years of age. In the absence of any evidence suggesting that age was the but-for factor in instituting the new procedure, plaintiff has not established sufficient evidence to support the fourth element of an ADEA claim.

The Court finds that with respect to her claim of age discrimination based on the ear cleaning directive, plaintiff has failed to allege a prima facie case of age discrimination because she has not shown that she suffered an adverse employment action. Accordingly, the Court finds that defendant is entitled to summary judgment with respect to plaintiff's first claim of age discrimination.

2. Termination

Plaintiff appears to assert that her termination by defendant violated the ADEA in two respects. First, plaintiff claims that she was terminated on the basis of age. (Compl. ¶ 15). Second, plaintiff claims that defendant violated the ADEA "by retaliating against plaintiff

20

because she opposed a mandate which she reasonably viewed as being discriminatory." (Compl. ¶ 17). The Court addresses each in turn.

### a. Termination on the Basis of Age

Defendant argues that plaintiff cannot establish a prima facie case that her termination was discriminatory in violation of the ADEA. Specifically, defendant asserts that plaintiff has failed to show that her termination occurred under conditions giving rise to an inference of discrimination.

Plaintiff contends that jurors may infer age-based animus on the part of Commander Emerson from the Commander's "loud and humiliating rant to the effect that plaintiff, aged 65, 'lacked speed' and was 'too slow.'" (Pl.'s Mem.[16] at 18). Plaintiff contends that the delays experienced in processing applicants on April 9 and 10, 2007, were caused by computer problems that delayed the start of processing by four hours and not as a result of plaintiff's conduct. (Id.) Plaintiff argues that apart from her comments, Commander Emerson's malice toward older people is further evidenced by the fact that she hired Dr. Reodique, a younger individual,[17] to replace plaintiff, and refused to hire Dr. Greenberg, who was 70 years old at the time, based on Dr. Deyro's belief that Dr. Greenberg had "too many memory lapses." (Id. at 18).

Plaintiff provides evidence which, she contends, demonstrates that the government's reasons for firing her were pretextual. (See id. at 18-24). Although plaintiff is correct that "the issue of pretext does not arise until the third step of the McDonnell Douglas framework,"

---

[16]Citations to "Pl.'s Mem." refer to "Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, which was filed on January 5, 2011.

[17]Dr. Reodique was 58 at the time she was hired. (Wotorson Aff. Ex. 12 at 12).

(Reply[18] at 7; see discussion supra at 13), these circumstances may also serve as evidence in support of a prima facie case of discrimination.

Plaintiff argues that the numerous inconsistencies in the government's evidence relating to plaintiff's pace and whether she had been counseled exhibits "a coordinated effort on the part of the Government to cover-up Commander Emerson's questionable decision." (Id.) Plaintiff contends that prior to April 10, 2007, she had never been told she was "too slow" or counseled about her performance. (Id.) She further contends that the trier of fact can infer that the assertion that she had been counseled was an attempt by the defendant to conceal age discrimination. (Id. at 23).

Given plaintiff's "de minimis" burden in presenting a prima facie case, see Berube v. Great Atlantic & Pacific Tea Co., Inc., 348 Fed. Appx. at 686, the Court finds that plaintiff has met this burden. Upon a showing of a prima facie case, the burden of providing a nondiscriminatory justification for its action shifts to defendant. Defendant has proffered the following nondiscriminatory justification for its termination of plaintiff: "plaintiff was terminated, at the very least in part, because she failed to exhibit the expedience, mission focus, and adaptability to problems and situations that arise in any given workday, and particularly on April 9 and 10, 2007, deemed necessary by Commander Emerson to contribute to the improvement of operational performance at NYMEPS." (Reply at 11).

The burden now shifts to plaintiff to show that the reason given by defendant is pretextual. Plaintiff must be able to prove "by a preponderance of the evidence . . . that age was

---

[18]Citations to "Reply" refer to defendant's Reply Memorandum of Law, which was filed on January 4, 2011.

the 'but-for' cause of the challenged employer decision." <u>Gross v. FBL Fin. Servs., Inc.</u>, 129 S.

Ct. 2350 (2009). The Court must, "therefore, determine . . . whether [plaintiff] has raised

sufficient evidence upon which a reasonable jury could conclude by a preponderance of the

evidence that her age was a 'but for' cause of [defendant's] decision to fire her." <u>Gorzynski v.</u>

<u>Jetblue Airways Corp.</u>, 596 F.3d 93, 107 (2d Cir. 2010).

In support of her contention that the justification given by the government is pretextual,

plaintiff argues that "Defendant has come forward with an ever-expanding list of unsubstantiated

anecdotes and justifications for plaintiff's termination. Each of these justifications are

demonstrably false." (Pl.'s Mem. at 18-19). Plaintiff contends that, contrary to defendant's

assertions, she had never been accused or warned that she was too slow; she has never received

counseling regarding the pace of her work; that complaints from other departments were not

about plaintiff; and, because "there is no mandated, or even suggested, processing time," plaintiff

did not take excessive time in evaluating potential candidates. (Pl.'s Mem. at 18-24). In further

support of her claim that defendant's stated reasons were pretextual, plaintiff relies on the

testimony of Dr. Deyro, in which Dr. Deyro concedes that he had never counseled plaintiff about

the speed at which she processed applicants or about her temper. (Pl.'s Mem. at 13). Dr. Deyro

was even unsure as to whether he had ever told his superiors, including Commander Emerson,

about plaintiff's performance issues, and unsure as to whether he had ever written one of the

memos. (Pl.'s Mem. at 19; Wotorson Aff., Ex. 13 at 24-26). Plaintiff argues that despite the

Separation Memo and the Memorandum of Record referencing her prior counseling, defendant

now concedes that plaintiff was never counseled.

Defendant, however, cites 5 C.F.R. § 315.804(a) in support of its position that there is no

right to advance notice of any performance issues or disciplinary action; the regulations require only that a probationary employee such as plaintiff be notified of a termination decision in writing, along with the reasons for the termination. (Id. ¶ 8 (citing 5 C.F.R. § 315.804(a))). Defendant contends that during the probationary period, the employer is given an opportunity to determine the employee's fitness for the position, and if the employee "fails to demonstrate fully [her] qualifications for continued employment," the employer "shall terminate [her] services." (Id. ¶ 7).

Plaintiff disputes this interpretation of the regulation, arguing that it is silent on the issue of counseling. (Pl.'s 56.1 Stmnt ¶ 8). Plaintiff further argues that regardless of whether counseling is required by the regulation or not, there is a sufficient basis for the jury to find pretext based on defendant's inconsistent and fabricated explanations. She cites the April 11, 2007 memorandum relied upon by defendant which purports to discuss plaintiff's performance deficiencies, contending that it is "a complete fabrication" (id. ¶ 67); she believes that she will be able to demonstrate that all of the comments made after the fact about her speed and her temperament were merely an effort to "cover-up Commander Emerson's questionable decision." (Pl.'s Mem. at 19). Plaintiff argues that because she can prove the falsity of defendant's "anecdotes and justifications," the stated reason for her termination must also be false: "[j]urors will likely have strong reservations about anything the Government puts forward, because so much of it is false."[19] (Id. at 23).

---

[19]Another reason for plaintiff's termination originally advanced by Commander Emerson was that plaintiff was incompetent because she qualified a person with dwarfism for military duty. (Pl.'s Mem. at 22). After reviewing the relevant documents, the Commander conceded that plaintiff had not qualified this applicant. (Id. at 23).

Although plaintiff concedes that defendant hired Dr. Reodique, aged 58, she argues that this does not "insulate[ defendant] from any taint of age discrimination" because this hiring occurred "*after plaintiff had already filed an EEO claim of age discrimination*." (Id. at 24 (emphasis in original)). Under these circumstances, plaintiff concludes, "[j]urors will likely be highly suspicious . . . of the forty-something year old Emerson telling the 65-year old Plaintiff that she 'lacks speed.'" (Id. at 24).

Given the numerous factual disputes raised by the plaintiff, the Court finds that a reasonable trier of fact may choose to disbelieve defendant's proffered nondiscriminatory reason for terminating plaintiff. The trier of fact may conclude that the reason is pretextual, and that plaintiff's age was the "but-for" cause of her termination. Accordingly, defendant is not entitled to summary judgment on this issue.

b. Retaliation

Plaintiff argues that she has also established a prima facie case of retaliation based on her complaint to Dr. Ruiz that ear cleaning was not part of her normal job responsibilities and that her contract did not include rendering treatment. (Pl.'s Mem. at 25). She claims that the requirement was discriminatory because no other physicians in the MEPSCOM system were required to perform the task; only she and Dr. Deyro, because of their ages, were asked to do this. (Id.) Plaintiff argues that her complaint to Dr. Ruiz constituted "protected activity," of which Commander Emerson was clearly aware, having asked plaintiff who called Dr. Ruiz and stating that no one informed her of the problem. (Id. at 25). Plaintiff claims that the "temporal proximity between the protected activity and the adverse action of less than a month is strong

evidence of retaliation." (Id. at 26).

Defendant contends that plaintiff fails to establish that she undertook "protected activity," the first element of a prima facie case of retaliation in violation of the ADEA. (See discussion supra at 15). "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." Sharpe v. MCI Comm. Servs., Inc., 684 F. Supp. 2d 394, 406 (S.D.N.Y. 2010) (quoting Bryant v. Verizon Comm. Inc., 550 F. Supp. 2d 513, 537 (S.D.N.Y. 2008)). When such action refers to a complaint lodged with superiors, "[t]he onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining of unfair treatment generally." Id.

Plaintiff fails to allege, either in her Complaint or her Statement of Disputed Facts, that her complaints about the ear cleaning directive included allegations that the directive was motivated at least in part by discriminatory animus. She alleges that she "reasonably complained to Dr. Ruiz, the colonel assigned to supervise the Northeast Sector, that ear-cleaning was not a part of her normal responsibilities." (Compl. ¶ 8(c)). Although plaintiff notes in the Complaint that she "believed she was tasked to do this because of her age," she does not allege that she informed her supervisors of this belief. (Id.) In her Opposition to the present Motion, plaintiff essentially repeats the allegations of the Complaint: "Here, plaintiff complained to Dr. Ruiz, a colonel assigned to supervise the Northeast Sector, that ear cleaning was not a part of her normal responsibilities. Plaintiff reasonably felt that mandating that she and Dr. Deyro perform ear cleaning was discriminatory . . . ." (Pl.'s Mem. at 25). Plaintiff's Statement pursuant to Rule 56.1 likewise fails to include a factual allegation that she ever indicated to her supervisors, in any

of her complaints about the ear-cleaning directive, that she believed that the directive was discriminatory in nature or was motivated by her age.

Having reviewed the plaintiff's submissions, the Court finds that plaintiff has failed to allege that she engaged in protected activity and therefore has not pleaded facts sufficient to support a prima facie case of retaliation under the ADEA. Accordingly, the Court grants defendant's Motion for Summary Judgment with respect to plaintiff's claim of retaliation.

## CONCLUSION

After reviewing the parties' papers, the Court grants in part and denies in part defendant's Motion for Summary Judgment. The remaining claim, that plaintiff's termination was the result of unlawful discrimination, shall be addressed at trial. The parties are directed to appear at a status/settlement conference on June 10, 2011, at 4:00 p.m.

**SO ORDERED.**

Dated: Brooklyn, New York
      June 3, 2011

                                      _Cheryl L. Pollak_
                                      Cheryl L. Pollak
                                      United States Magistrate Judge